I am Robert Bryan. I'm attorney for Terry Bemore, the appellant in this case, and Cheryl Cotterell, as the Court knows, is co-counsel. Even though there were 16 issues initially certified for review by this Court, we're only going to argue 1, 2, and 3, which deal with false alibi, the fraud of trial counsel, and also the ineffective assistance of counsel for failing to properly explore, develop, and present mental defenses, both at the penalty and particularly at the guilt, but particularly at the penalty base. I would like to, just as an overview, point out, which this Court probably has noticed in our presentations and writing, that this case involves a rather lethal mixture. It's not unique. I guess this Court has seen it all. But in my experience, it's unique, and that is of an attorney who's involved in pervasive fraud in the trial court, the failure to develop and present mental defenses even when the trial judge points out there's a lack of any evidence of Mr. Bemore's having any mental problems, and the prosecution even ridiculing the offense because it — pointing out that it didn't exist, with trial counsel just remaining mute. Mr. Peketchny has never filed any declaration in this case, or at the college or anything. That is correct, Your Honor. Is that right? That is correct. But he exists, right? Yes. I mean, not on the record, but I met with him when I first got involved in this case at the — before the California Supreme Court. But he hasn't offered to make any admissions, if you will, regarding his conduct or even to try to explain his conduct. And I have pointed out, or we have pointed out in our briefing, that he made — for example, he paid his investigator for 5,800 hours of work, $145,000. And yet the investigator did very little. Elizabeth Barranco has pointed out in her declaration that was before the State and this Court that Charles Small, the investigator, did virtually nothing, or very little in the case. She points out that at one point she confronted Mr. Peketchny and said, look, Small is not doing anything, and this is a capital case. They're seeking the death penalty. And Peketchny then at that point admitted that Small was doing very little, but he mentions something about his — him being unfaithful to his wife and Small knowing about it and whatever that's worth. I guess I would like you to explain how this could be an independent basis for reversal, as opposed to simply a datum to negate any argument that simply the amount of time put in on paper demonstrates the amount of energy that went into the defense. I mean, I understand that it is helpful to negate a notion, which at times the State says, which is, you know, they did all — they must have done a lot of investigation because they spent all this time. So you say, well, actually, they didn't spend all that time that was for it. But beyond that, what else is it useful for? Well, it's our position that misconduct, for example, the law clerk, 1,500 hours, who did no work on the case and never knew nothing about the case, that the inescapable result with this much time, let's say 6,000 hours or 5,500 or whatever figure you pick is an enormous figure, that the lack of that in any case of this magnitude, it seems almost inescapable that it would have to have some prejudicial effect on the defense and on the right to a fair trial of the defendant. In this case, we do know that there was a wealth of evidence from one report, a psychological report that Ms. Barranco, who was — her responsibility was a felony case. She brought in a psychologist, Kenneth Feynman, well in advance of trial. Dr. Feynman found a smorgasbord of mental illness, most of which Mr. Beemore suffered from since childhood. Now, can I make a direct connection, can we make a direct connection between that not being presented to the jury, actually hidden? She said they actually put that preliminary — it's a preliminary draft report in the back of the file drawer, and it never saw the light of day again until we — Because she thought it was a bad report, and in some ways it's not such a hot report. Well, the report does point out the likelihood of a bipolar disorder or a neuropsychological infirmity, poor impulse control, pathologically impaired judgment, intermittent explosive disorder, problems — and this goes really to the heart of this case — problems with control and impulse ability, a learning disability, and ADD. And these existed, Dr. Feynman felt, probably since childhood. But, Your Honor, Dr. Feynman specifically recommended that there be a psychiatric evaluation based on his preliminary report. He said this is preliminary. That evaluation never occurred until state post-conviction habeas proceedings, in which we brought in Dr. Fred Rosenthal, a board-certified psychiatrist who found that the defendant did have organic brain damage. And he agreed with the preliminary findings of Dr. Feynman. Now, I would suggest — I have a question. Was the Rosenthal declaration before the State court or the Federal court? It was before the State court and Federal court. But I thought all — well, I read it. I thought all he did was essentially review what Feynman said. He also had interviews with our client. I see. Okay. And did whatever doctors do for a neurological evaluation in meetings with the client. And he found that, for example, in going to the — this would not go to guilt, but it goes to penalty — a learning disability that would be very important, because the prosecutor in the penalty phase pointed out that Mr. B. Moore, being a basketball star, went to all of these different colleges. He washed out of each one, but that he had all these opportunities. And the prosecutor pointed out that, no, he was out partying, he was drinking, he wasn't taking advantage of the opportunities provided to him through the basketball scholarships. What the jury and the trial judge never knew was that Mr. B. Moore did have these severe learning disabilities. He did have organic brain damage. And I would like to point out, if I may, Judge Gill, the trial judge, at the time of sentencing Mr. B. Moore to death, he compared this case to the Cosby case, the co-defendant. And if the court will recall, the Cosby case involved a defendant who had not only — was charged with this murder, but also with a second murder. And so the case was severed. It was tried before the B. Moore case. The defense in that case was not innocence, as in the B. Moore case, that alibi defense, silly alibi, which Ms. Potterill will address in a little while. But it was an admission that he was involved, but he had mental illness going back to childhood. And Judge Gill, when he sentenced Mr. B. Moore, stated that I would be intellectually — would not be entirely intellectually honest to say that I haven't had in the mind the knowledge. But the jury in the Cosby case, their judgment was that in Mr. Cosby, the appropriate penalty was life. He said life without parole, but it actually got life in this case. Cosby did. In the case of Mr. Cosby, there was some fairly convincing evidence that as a result of a head trauma he sustained as an infant, I think at the age of three, being struck by an automobile, there was some demonstrable physiological damage and deficits. There's no such evidence in the case of Mr. B. Moore. Now, this report of Dr. Fineman was sitting back at the office in the back of a file drawer of defense counsel. Even at sentencing, aside from the jury being deprived of any of this information of mental illness, at sentencing when Judge Gill points this out, the contrast between the two cases, the two defendants, the defense attorneys remained mute. Even though I feel that Ms. Baranko, we feel that Ms. Baranko is commendable, that she is willing, she was in the eye of the storm to reveal the misdeeds of Mr. McKechnie, and that he did very little in the case. As Joe Allen Demetrius, the psychologist who's a jury selection expert in this case from Pasadena, pointed out that she had never seen somebody as ill-prepared as Mr. McKechnie in this case. And she said, I was there for window dressing. They paid me $27,000. I did nothing because McKechnie wouldn't listen to me. He did not know the case. He did not know the facts. He was, you know, out to lunch. Even though Ms. Baranko talks about Mr. McKechnie not being prepared, there being virtually no investigation, when she figured out there was a fraud going on in this case, she confronted Mr. McKechnie. Now, she had only been out of law school two years. This is her first murder case. She confronted him about this and said, look, Charles Small, the investigator who ran up $5,800, hours of investigation, he's doing virtually nothing. And she says that McKechnie admitted to her the truth of what she was saying and got into this thing about his wife, whatever that was about. But yet – Well, Ms. Baranko, her name was – she was the second counsel? Yes, Your Honor. And she was appointed independently? Yes, she was appointed separately from Mr. McKechnie at a different time. And she basically was responsible for the entire penalty phase? Yes. Right. Counsel, Judge Gould and I have a question. Yes, Your Honor. If I may. Turning just looking solely at the penalty phase, would presenting the medical impairment evidence at the penalty phase, let's say what Dr. Fineman said, would that have interfered in any way or contradicted in any way other themes or other points that they were trying – that the defense was trying to prove in the penalty phase? Your Honor, the evidence presented at the – the focus of Ms. Baranko's presentation at the penalty phase, as the court will recall, is good guy evidence, that he was a great guy. He was a minister, a Baptist minister. He went to Bible college, and everybody loved him. I frankly do not see how there would be a conflict, and even though it's not before the court, I've had cases in which we presented also mental evidence when there was another thrust maybe at the penalty phase, because it seemed derelict, it would be derelict on counsel's part not to present such evidence, because it's so crucial. But one thing I wonder about, about the Dr. Fineman report, I mean, by itself, it's at least a mixed bag. But the real question is whether it should have triggered further investigation, it seems to me, which is whether it should have triggered further investigation. Yes. Did he specifically say there should be further investigation? Yes. That is in his declaration. I do not recall whether it was in his report. I'm embarrassed to say. Right. But he did say, point out in his declaration, that he had recommended a full evaluation, that he was only the first step. I see. In other words, this was a draft report, and he's saying that he gave some verbal or other. Yes. It was even unsigned. I see. Because the report itself doesn't seem exactly to say that. I mean, it does say, you know, I'm not sure what the diagnosis is, but it doesn't specifically say that further investigation should be done. My recall, Your Honor, is that he does say that in his declaration, and counsel just said we're not going any further. Counsel, is there a way in the penalty phase to sort of juggle or smooth over the concept so that basically a defense lawyer could argue, well, he's a sociopath, but he's pathological, but he's still a good guy? Well, that actually. Does one seem negative to the other? That actually, Your Honor, came out in the trial. There was a psychologist who testified, Dr. Bucky. He did no psychological evaluation. He was shocked later to find that there was this report of Dr. Fineman, because the defense had not told him, but he simply testified about the effect that growing up in a drug environment would have on someone such as Mr. Beemore. But it was brought out in his testimony of the defendant possibly being a sociopath. So that evidence is there. So the defense, it seems to me. But also, Dr. Fineman didn't say that. No, Dr. Fineman, Dr. Bucky. No, but what Dr. Fineman said is it could be a bipolar affective disorder or it could be an intermittent explosive disorder. Consideration must be given to the possibility of an antisocial personality disorder. So it seems to me that he was simply laying out possibilities for further investigation, and if somebody had tried to cross-examine him with this, all he would have said is, well, I didn't say he had it. I said it's a possibility. Yes. Yes, he said he likely has bipolar. It's likely this. It may be this. That, as you're pointing out very correctly, that is exactly why he said we need more of an investigation into Mr. Beemore's background and mental state. And that was the gap that was filled in by Dr. Rosenthal years later in the state post-conviction proceedings. But I might also point out and first go into I would like to finish up addressing the question of this good guy evidence that the penalty faced. I don't see a conflict, and I'm just one person, but I don't see a conflict between a client being a great guy or a great lady and having this great religious background. And also pointing out that this person has been hampered by mental illness throughout his or her life. I don't see the conflict. Now, if you want to get into him going into a rage and going out of his mind and killing the deceased, maybe a lawyer might want to steer clear of that. I don't think it should have been. That was the heart of the case and should have been presented. But let's give the defense the benefit of the doubt. Still, where is the conflict presenting severe mental illness, a bipolar disorder? I mean, lawyers have bipolar disorder, judges, doctors. I mean, it's something that afflicts any of us at any time. And what's the harm in presenting that? I don't understand. And even when the judge is sentencing, points out the lack of mental state evidence in this case, it was there and nobody said a word. And I find that, as I said, very difficult to comprehend. I would also like to point out that there cannot be, I would suggest to the Court, there cannot be a, this written office, well, this was a strategic decision by counsel, because they did not do the investigation. They did not take the next step. For example. Do we know whether McKechnie ever saw the Senate report? Ms. Baraka said he did, that they were aware of it. No, Baraka was, but I'm asking. She said he was aware. She said whether there was more than one copy, I'm not sure. That's occurred to me, because she said, I think she said I put my copy in the back of the drawer. So I assume maybe there were two. But she said they did talk about it. I mean, it wasn't some mystery that she was off somewhere else isolated in a vacuum from McKechnie. She was talking to him apparently on a very regular basis prior to trial. But I would like to point out that Strickland addresses this, a number of other cases, that for there to be a strategic basis for a decision, there has to be a reasonable investigation. And that did not occur in this case. For example, the witnesses who testified for the prosecution about neighborhood people who talked about, I see my time's about up, so I'm going to stop in just a moment if I can make this one point. They talked about him making admissions to them. Each one says in declarations before this court that had the defense asked me in cross-examination, I would have spoken to the fact that he was crazy, a couple of them said. No one said he's crazy. Somebody else said he was drooling at the mouth sometimes. Even one was consistent with what Dr. Rosenthal said, and that was he pointed out that the defendant had a history of having epileptic-type seizures. If I may, unless there are any other questions. Were these in affidavits before the State court? Pardon? Were these affidavits before the State court? Yes, Your Honor, they were. Thank you. You're not going to talk about the alibi at all? Ms. Connery. Oh, I see. Okay. Thank you very much, Your Honor. Good morning, Your Honors. May it please the Court. My name is Cheryl Cotterill. I'm arguing for Appellant Terry Bouiemore. As Mr. Bryant indicated, I'll be addressing Argument 1 before this Court, which really has two parts. The first part deals with Mr. McKechnie's ineffectiveness for presenting an uncorroborated, uninvestigated alibi defense. And the second part, which the district court found was unexhausted, deals with McKechnie's actual involvement in concocting the false alibi and advising and instructing his client to lie. So first I'll talk about why the California Supreme Court's denial of this argument was contrary to an unreasonable application of Strickland, as well as an unreasonable determination of the facts. The district court denied this claim, finding that the California Supreme Court's denial was reasonable, and we take issue with that. McKechnie's failure to investigate the alibi was ineffective. Can I just go back to the history of this? Okay. My understanding, and I just want to check this because it's kind of murky in the briefs, is that the this warehouse records crime was actually charged by the prosecution, and the adipoliminary hearing, afripoliminary hearing, was found to be probable cause that he actually committed that robbery. That's correct, but go ahead. And so what bothers me about it in terms of your argument is that at least initially the – well, maybe it helps your argument as to how foolish this alibi defense was, because the – it appears that the prosecution originally didn't see any conflict between the two. They were comfortable with prosecuting both of them originally. And there's no reason why they wouldn't be. Even a juror said that it would be possible to commit both crimes because they happened at two different times. That's why it was such a – So the most fundamental thing is that the alibi wasn't an alibi. Correct. It was not even an alibi, and a simple timing experiment would have shown that the warehouse robbery happened at 9 p.m. But you didn't really have to do the timing. This is what I'm saying. I don't know if you even had to do the timing experiment. All you had to know was that the prosecution began from the premise that they weren't inconsistent. It wasn't an alibi. It happened at two different times. And that was a crucial issue for the jury. An investigator for the defense actually went and spoke to some of the jurors. One of the jurors did an out-of-court experiment and determined that there was plenty of time to do this. But that doesn't matter. I mean, we can't take that into account or anything else. But there was testimony at the trial by a prosecution witness of that. Correct. That it only took 16.23 minutes to drive from the warehouse robbery – the warehouse record store to Aztec Liquor. And so that was – that was very damaging. Another very damaging part about this sole defense presented in a death penalty case was the fact that there were no corroborating – corroborating witnesses. And this is a finding by the California Supreme Court. We do have some factual findings that they issued in their opinion on direct appeal. They talk about essentially how confusing Mr. Beemore's testimony was, as well as the fact that the two witnesses presented in support of the alibi, neither one could identify Mr. Beemore confidently. But the problem that a lawyer has under these circumstances, though, is what is your contention about what should have been done instead? No defense? Oh, there were – there were – as Mr. Bryan indicated. No defense is a possibility. I mean, in terms of influencing the penalty phase and everything else. Certainly the fact that the client got on the stand and lied to the judge and the jury, as we allege, certainly that was a problem. And I – it's understandable that it would upset the judge and the jury, especially since the judge had just sat through several weeks of evidence of this case in the Cosby trial. If I may briefly just talk about the unexhausted claim in the Ryan's motion and the recently submitted Bronco declaration, we would have to – Well, I mean, the real problem with that is, I mean, whether it's exhausted and therefore should be considered now or unexhausted and should be a new claim, what do we do with the fact that she was there the whole time and could have submitted this, you know, 15 years ago? She – she recently revealed that she was afraid or she was hesitant to say anything about her knowledge or acquiescence in the perjured testimony, the false alibi, because she was a member of the California Bar at that time. And she apparently was hesitant and didn't want to say anything about the perjured testimony. She now is able to say something, and we think that this claim, if it was not adjudicated on the merits by the State court, that it should be fully explored, that there is no bar to hold an evidentiary hearing. Also, what exactly did she say? I mean, in fact, everyone had been through this preliminary hearing. It was no mystery. And I – she certainly may have suggested it, but what is the evidence that she made it up? The evidence in her declaration of April 2014, she states that having done no investigation of the alibi defense, when it came time to present evidence in support thereof, McKechnie found himself left with only one witness, the defendant. Instead of competently preparing a legitimate and honest defense in the two years that preceded the trial, McKechnie spent just two hours at the county jail preparing his client to lie. Without investigating the potential alibi or any other defense, McKechnie told Behmor that his only hope for freedom was to testify that he had been committing the warehouse robbery at the time of the murder. That doesn't sound to me, I mean, except for the word lie, that she made it up. In other words, I mean, it's not unusual for lawyers to say to their clients, you know, what, you know, did this happen? Could you – I don't see where the – where the McKechnie fabrication is specifically clear. I guess the – I mean, I gather from the beginning they intended to make you have this alibi, right? No. They switched gears in the middle of the defense. I think Roronco talks a little bit about that in her declaration. And in the declaration that – her most recent declaration, she said that Logan McKechnie had Terry Behmor give false testimony and told him that there was no other defense available. And we find that this is very damaging. And it also involves a conflict of interest, because there may have been a reason why he – the judge McKechnie – I mean, I'm sorry, the attorney, Mr. McKechnie chose to present a false alibi as his only defense, because it was a rep that didn't require that much time to prepare and it didn't require the use of many experts. So if there are no further questions, I'd like to use the remaining time for rebuttal. I have one question, and I'll ask Judge Weinhart to give you your rebuttal time anyway, if you would, please. Okay. Thank you. My question is, does the record tell us, in the record in this case, if there have been any bar disciplinary proceedings against either of Behmor's lawyers, and if so, the result? The record should in the Federal court, I believe, and Mr. Bryan is more familiar with the record, but I believe there are issues of Ms. Barranco's disciplinary proceedings, and she was disbarred in 2006. She was what? She was disbarred in 2006. I thought she was disbarred as a result of this case? No. In other cases? Yes. And what about McKechnie? McKechnie left San Diego, and he's still a practicing attorney, as far as we know. And there are a number of allegations of violations of Brady and Napu. Were any of those allegations true? Not that we're aware of, no. It might have been, if anybody believes those allegations were true, it might have been advisable to refer those to the bar also. Are you referring to the Brady, the arguments in the brief before this Court with regards to the Brady misconduct by the process? The Napu particularly, yes, but Brady and Napu, they were very serious allegations of a series of violations by the prosecution. And as far as you know, nobody ever complained to the State Bar about those. As far as I know, no, but Mr. Bryan may have more knowledge as to that, that issue. Thank you, counsel. Thank you, Your Honors. Counsel. Thank you, Your Honor. May it please the Court. Holly Wilkins on behalf of the Respondent. With respect to the mental defense discussion, I did want to point out in response to Judge Berzon's question with respect to Mr. Fineman, whether or not he had recommended further examination or investigation with respect to Mr. Beemore. In his declaration that was before the State court and the district court, he does indicate that he may have made such recommendations if he had been privy to subsequent information that was provided by habeas counsel. But the recommendation was fairly much implicit in the report, which essentially said it might have been this and it might have been that and it might have been that, and he was not a psychiatrist, either. He was a psychologist. So it would appear that this was a draft, and he also characterizes it as a draft report, so it would seem that whether he specifically recommended further investigation since it didn't come to a conclusion but provided possibilities, that if he wanted to, that a competent lawyer would have done further investigation. Well, I would agree that a lawyer could see that possibilities did not translate to actualities, and if they wanted to tactically present such information, they would have been. So, for example, he said it might have been bipolar and it might have been intermittent explosive disorder, which he said had an organic basis, and it might have been sociopathy. So wouldn't you want to know what it was before you decided on his offense? Well, the opening the door to the evidence of an antisocial personality disorder, I would not have pursued it further, because under no circumstances, given the facts of the case. But he didn't say he had it, he said it was possible. Correct. So, therefore, you want to know before you make a decision. You would not need to do further investigation under the circumstances to make a tactical decision that it would not be in the best interest of your client. What's the reason you say because you wouldn't want to open the door? You would not want to open the door to the evidence of antisocial. How would you open the door? By presenting. We're not talking about presenting. We're talking about finding out what the facts are. You wouldn't want to find out what the facts are? No, you don't need to find out additional information about Mr. Beemore's mental health condition when you have already made a tactical decision. How can you make a tactical decision about what you can do, suppose a further investigation showed that he was insane? You wouldn't want to know that? Because you've made a decision? Speaking from this case with what was known about this case and what we know about this case, the defense was one of alibi. But that's the question, not the answer. Was that decision made in a competent fashion or not? Yes. Yes. Without knowing what his mental condition was? There was sufficient information from the assessment by Dr. Feinman, who is a qualified psychologist, to give the defense enough information from which to know that further investigation was not necessary. And we know that. Was not desirable? Correct. And one of the – And first you said the reason it wasn't desirable was because you would be opening the door. Now I assume we're not talking about opening the door. We're talking about there being no reason to find out whether he had organic brain disorders or an explosive whatever it is, that there's no reason to find that out because our alibi defense is so strong that it overrides any possibility of showing a mental disorder. The facts of the crime combined with the pursuit of the alibi, combined with what was known about Mr. Beemore, most importantly, the antisocial personality which dovetails. But he didn't say he had it. He said it was possible. So how could that be a factor in a decision until you do more work? You don't need to do more work when the defense attorney had before him the circumstances that he faced. And you asked if there was a declaration from Mr. McKechnie. And there isn't. And there is no declaration from Mr. Beemore. And Strickland informs us that one of the most critical components in a defense attorney's strategic thinking and in subsequently assessing the defense of a particular defendant is what the defendant said and what the attorney learned from his client. Yeah. One of the things Dr. Fineman said after he said he could have bipolar disorder and he could have an intermittent explosive disorder and consideration must be given to the possibility of an antisocial personality disorder, then he said understanding Mr. Beemore is no easy matter. Doesn't that suggest that, A, this has no conclusions, and, B, somebody ought to find out more? No, not under the circumstances of this case. Let's go to the alibi. Okay. I have a question on Judge Bressona's. I'm sorry? Yes, Your Honor. I have a question on your question. Go ahead.  Go ahead. Ms. Wilkins, I wanted to ask you the same question I asked Mr. Frye. That is, is there anything in the mental impairment evidence that would have been counterproductive, developing that would have been counterproductive to other themes that the defense was arguing in the penalty phase? And I ask this with the background that I've seen an awful lot of cases where defendants have had a vigorous defense in the liability or guilt phase, but their defense lawyers did a lot of work on mental issues to have in reserve for a penalty phase if it occurred. Yes, Your Honor. With respect to this particular instance, the lingering doubt that would carry over from the guilt phase would be undermined by learning that the particular defendant had the earmarks of an antisocial personality disorder. But more importantly than the lingering doubt would be the effect upon what was a very powerful mitigation defense from over 40 witnesses attesting to all of Mr. Beemore's good deeds, his religious beliefs, his serving as a police officer, serving in the armed forces, being a husband to two children, a father. And people who have bipolar disorder can't do these things? Excuse me? People who have bipolar disorder can't do these things? I wasn't speaking of bipolar disorder. I know, but the other the whole problem here is that it has no ultimate finding. There are only possibilities. So one possibility is that if they investigated, they would have found bipolar disorder. We don't know. I would submit, Your Honor, given the circumstances of the crime and Mr. Beemore, that it would be devastating to have the prosecution meet the mental defense of bipolar disorder with evidence that Mr. Beemore is a sociopath, which would explain all of his good conduct coming into the torture murder of a liquor store clerk for money. It would explain every facet of Mr. Beemore's life and his crimes, and it would negate so convincingly all of the mitigation evidence instead of an individual who had overcome his childhood and who had served admirably as a police officer, as a member of our military, who had parented, who had been a father, who had descended into drug abuse, and then, even after this horrific crime, had redeemed himself and become a good prisoner, all of which would be readily apparent and explainable by the prosecution's rebuttal evidence of an antisocial personality disorder. Which they could have done anyway. Excuse me? Which they could have done if they wanted to. The prosecution? No. Wasn't there evidence that he wasn't such a good prisoner, that he had organized poisoning? There was an incident, a rather bizarre incident. Well, you talk about him as a model prisoner, yet you introduced evidence that he had organized a poisoning plot. Yes, that was to rebut all of the testimony from five separate correctional officers attesting to Mr. Beemore's good qualities as an inmate. He was a leader. He was the tank captain. There was very extensive, compelling evidence of his good conduct in custody, which was, in fact, rebutted. And is that inconsistent with having bipolar disorder? You're assuming that he indeed... I'm not assuming anything. I'm asking you a question, which is, is that inconsistent with having bipolar disorder? Being a good inmate, a bad inmate? Being a good inmate. No. All right. Can I ask another question? Are you going to talk about the alibi defense at some point? I was going to ask you, when does a record show that the counsel decided on an alibi defense? Quite early. What does it show? Well, in advance of the beginning of the trial, Mr. McKechnie, according to Ms. Barranco, indicated that they would be proceeding with an alibi defense. She subsequently indicated that, upon reflection, she didn't find it to be a good one. But that's hindsight. What was said in the opening statement? Ms. Barranco says that what was the emphasis in the opening statement was essentially on debunking the prosecution's case with regard to where the car was and other details. Did McKechnie say in the opening statement that there was going to be an alibi defense? I don't recall the particulars. I'm not sure it was highlighted. I see. That would be a matter of tactics. I'm sorry, what? That would be a matter of tactics. We're asking facts. The question was what did it say. The answer to the question is either you don't know or you do know. I don't recall the particulars. All right. That's the answer to the question. I do agree with the comments today that there was discussion about why he couldn't have committed the Aztec robbery. There were inconsistencies with respect to description. Now, one thing I noticed in your briefs is that you spent a great deal of time with regard to the alibi testimony suggesting that Mr. Beemore insisted upon it. Is there any evidence at all that Mr. Beemore insisted upon it? Yes. You can support the inference by virtue of the fact that he continued to insist upon his innocence in the post-conviction probation interviews. But there is no declaration from anybody that he was the one who wanted to put this on. Correct. There's no declaration from him. Okay. And that particular allegation. So there is no – I mean, the inference is from something he said later on, which has no – because he had already testified to this. But that doesn't demonstrate that he was the one who insisted on putting it on. So, I mean, all I'm saying is it seems to me that's just off the table, the notion of that the defendant may insist, but he – as to the effect. Because we have no evidence that he did insist. It is not off the table, given that this is a post-conviction proceeding. All presumptions favor the judgment. All presumptions favor the regularity. And it's incumbent upon Mr. Beemore to show, as he alleges, that it's Mr. McKechnie who put him on the stand. It was Mr. Beemore's decision whether to testify. That's his right. And we have no indication of any firsthand knowledge whatsoever that that was not the case. And that is conspicuously absent, given that Mr. Beemore knows full well what Mr. McKechnie told him. Mr. Beemore knows full well whether or not he robbed the warehouse and then robbed him. Kagan.  I'm saying that he didn't. He wasn't here robbing the warehouse. This was not really given much attention in the briefs on either side. But isn't it fairly pertinent to the evaluation of the viability of this alibi that the prosecution originally charged both and didn't think there was any inconsistency? There doesn't have to be an absolute impossibility that the same individual could be in two places within a time frame. But you can reasonably argue and infer that an individual 6'6", this is not – I think there's less than 1 percent of the country that's over 6'2". This is a very tall individual who has been identified, who has proceeded to prelim, who has been bound over with the descriptions of the vehicle. And then you have a crime that occurs approximately 45 to an hour later, 16 minutes away, but he would have had to have changed clothes, he would have had to have the motivation for more money. But nothing in anything that was said – in other words, the presentation did not even acknowledge the problem. I'm sorry, I don't understand. In other words, the presentation of the alibi in no way dealt with this timing problem. They, in essence, did. They seemed to be totally – and when there was a rebuttal of it, there was no response to the rebuttal. It just seemed completely, you know, surprised by the fact that, in fact, he could fairly easily have done both. That should have been obvious from – my point is only that it should have been obvious from day one, since both were charged. The fact that the distance between the two locations and the fact that it was not physically impossible was known, but that doesn't mean it wasn't a valid tactical consideration to go forward and suggest that an individual of this unique height – What does the height have to do with anything? I'm really confused. A 6-foot-6 armed robber is unique, and he's wearing different clothing, and he has to do quite a bit – Well, first of all, the witnesses didn't even say he was 6-foot-6. They said he was shorter than other people who were 6 feet. I'm sorry? The witnesses didn't say he was 6-foot-6. They seemed to think he was kind of short, shorter. No. One of them said he was relative to a 6-foot-1 person shorter. The initial description was 6-foot-2 to 6-foot-4. That one witness later suggested that perhaps she had overestimated the height because she was seated. But the initial description is consistent. I've never heard of an alibi that's not an alibi. I mean, where it is quite possible to – it doesn't negate your being in a place you're said to be. It does not negate it. You know, whether it's a misnomer of the term alibi, if alibi has to be limited to could not conceivably by any stretch have been in both places, but under the circumstances – But, you know, that makes him look worse because he said he needed the money. He said he was going around looking for some way to rob. I mean, it makes him, you know, all the more plausible that he went over to this other place to rob somebody else. In addition. In addition. He had enough money to go buy drugs. That's what he testified to. And quite frankly, when we look at Strickland, we cannot second guess. We cannot know what Mr. Beemore insisted upon with Mr. McKechnie. If you have a client, and we know this from this Court's decision in Bean, if you have a client who insists upon saying, I did not commit this crime because I was over robbing another place and that's what I want to testify to and I want to get on the stand and I want to tell the jury my story, you cannot fault counsel. But you still have an obligation. Counselor, I've got a question for you on that. Yes, Your Honor. If I may, please. I don't mean to interrupt. If Judge Bresan wants to interject something first. But alibi traditionally means you're in another place. You know, it doesn't mean you were in another place earlier and it would have been inconvenient or you question motivation to go to the second place. I don't really understand that argument because a lot of career criminals rob one place after another. It's not like they rob one place and then they have enough money so they're not going to rob the next place. How does that make this an alibi? Well, I understand your point and again, Your Honor, I don't want to be hung up on the semantic of alibi. I would rather emphasize that with respect to the representation of Mr. V. Moore that Mr. McKechnie was obligated to take into account whether his client wanted to testify and what he wanted to testify to. But that would be fine if, A, we had any indication that McKechnie had said to him, this is a lousy alibi. You know, if you insist you can put it on, but it's lousy. We have nothing like that. But again, in the context of post-conviction collateral relief, it's incumbent upon the Petitioner to state a prima facie case for relief. It's well established under California law and not inconsistent with what would be required in a Federal court that you make a requisite showing that you offer affidavits and declarations or explain your inability to do so. Well, we do have that. We have a declaration from Baraka that says that they spent exactly two hours going into this, preparing for this, the actual evidence on the alibi. So there is at least some education that this was not well thought out or investigated. Oh, no, that's not what Ms. Baraka said. Ms. Baraka said that there was a two-hour discussion preceding Mr. Beemore taking the stand, which she was not present for, which she was not privy to the content, nor can she know or have firsthand knowledge to indicate that that is the sum total of the communication between Mr. McKechnie and Mr. Beemore. As Ms. Baraka has consistently stated, she was appointed as second counsel. She had responsibility for preparing the penalty phase. She was not privy to the guilt phase investigation. She was not privy. Is there anything in the record to indicate that Mr. Small, who was paid a fortune, investigated anything about the alibi? We're not privy to the defense files. It was incumbent upon Mr. Beemore. I thought that the charging sheets are on the record. The bills. The bills? Yeah. I don't know that they're complete, and they don't have the specificity to indicate what he was doing with particular regard to the alibi. We do know that all of the police reports from the witnesses' statements, all of the preliminary hearing testimony from the warehouse employees, we know that all of that information was available to the defense. But again, if there is a gap in the record, that is not the responsibility of the respondent to address gaps in the record. It's incumbent upon Mr. Beemore's counsel to explain why readily available documentary evidence in support of their claim was not forthcoming. And Mr. Beemore has firsthand knowledge of what he said to Mr. McKechnie and vice versa. And we do not have one ounce of affidavit from Mr. Beemore on that. We have a handwritten affidavit provided to the district court about head injuries. Let me ask you a follow-up question on this. Let me assume for a minute that Mr. Beemore told Mr. McKechnie, I'm innocent and I want to present an alibi story that I was robbing this other store. I'll just assume he said that. Would a reasonably competent defense lawyer have investigated to know whether it is truly an alibi? He would want to know what was consistent and inconsistent and he would want to discuss that with his client. And for all we know, he did. Okay. So let's assume that's correct, that McKechnie investigated and he found out this other place is 15 minutes away and this second crime was 45 minutes later. So it's not really an alibi and he talked to his client about it and Beemore insisted on it. In that case, wouldn't a reasonably competent defense lawyer have developed other evidence to have in reserve in the event that was revealed that it was not the greatest alibi in the world? You mean would a defense attorney have been ready to undermine and contradict his client's testimony? No, that's not what he meant. Look, answer the question. Don't ask questions. The question Judge Gould asked you was quite clear. Answer it. I'm sorry, could you repeat the question, Judge Gould? Yeah. I think what I asked was would a reasonably competent defense lawyer have developed alternative evidence to present in the event that the weakness of the alibi defense was presented? If there were other avenues and his finite resources permitted him to and if he disbelieved what his client was telling him, I believe there would probably be some narrative as opposed to direct questioning. But for example, I mean, this goes to the assumption of inadequate resources. I mean, we have this at least set of information that seems to raise some inference that there were plenty of resources if, in fact, they had used the resources as opposed to pocketing them. Well, we don't know the degree to which resources were diverted, and I will agree there was extremely generous expenditures by the court, but we have no nexus to demonstrate that things that should have been done were not done. Yes, but all I'm saying is that we certainly this is pretty much what I was saying to your opposing counsel before. I don't know that it has any independent significance, but when you say, well, they have finite resources and that's why perhaps they couldn't do this, it seems to me to negate that. I respectfully disagree, Your Honor. And again, in the doubly deferential prism of both Strickland and Adipa, it cannot be said that the State court's rejection of the inferences that counsel is attempting to draw Well, did the State court What did the State court say about these financial allegations? It was a summary denial on state hazards. Right. So they didn't say anything. And, I mean, insofar as they were denying it as an independent claim, certainly that's entitled to double deference, but it doesn't, in evaluating the ineffective assistance, the specific ineffective assistance claim, it's a fact in the record that it's entitled to whatever significance it has. And it was considered by the district court, and the district court appropriately noted that you cannot draw a nexus between a disadvantage in terms of the defense that was proffered. But you also can't say that they did something because of limited resources. But it's not necessary, given the applicable standards and the deference that has to be accorded. There's no prejudice. But you're asking us to make up the fact, essentially, that the reason they didn't I mean, to infer that the reason they didn't do more investigation into at least trying to make something plausible out of this alibi is because they have limited resources. That seems to be negated by the record. No, I'm simply asking that the deference to tactical considerations on the record that the court has That's a different point, but that's not what you said. You began by saying, given limited resources. Well, then I apologize, because it's the latter point that I stand on. I see that my time is drawing near. Are there any additional questions or topics that the Court would like for me to address? I have no questions. Thank you. Thank you, Counsel. Thank you, Your Honors. All right. We'll give you a few minutes to rebuttal. I'll be very brief. Once in my life, Your Honor. First, I would like to point out that we're talking about funds that I believe the number is around $293,000 the defense received. That's not attorney fees. That's ancillary services. In this case, regarding the alibi, and this is in the record before this Court, at 2 ER 444 and 435, 435 and 444, 2 ER, the prosecutor even characterized the defense as, quote, unraveling because it wasn't true. And it was, and the prosecutor used the expression, he said it was a neological lie referring to the alibi. Do you know the answer to the question of what was said in the opening statement? Was anything said about the alibi? Your Honor, you know, I have to confess, I do not. I do not believe it was mentioned, but we can follow it up with a letter if we may submission to the Court. Well, we can read the opening statement. Okay. I do not recall that. I would like to also point out that at the outset you asked opposing counsel about whether there were disciplinary proceedings against either of the lawyers, and there were not. Ms. Bronco is disbarred, but she was disbarred for misconduct in other cases. But the issue has never come up as far as what happened to Mr. McKechnie is correct. He did leave San Diego and he's been practicing law for now a long time. I guess. In Merced. And I don't know that he's been in any trouble on the record whatsoever. What about this question of do we need to presume that Beemore insisted on this alibi? I do. A, I do not think it would be a presumption that it should be presumed. But B, I'm not sure what difference it makes. You're talking about and I ask that it be a given that a client, a defendant who has obviously some mental problems that have been existing for a long time and an attorney at some point we're not marionettes on strings and at some point we have to take responsibility. And if we have indications as you pointed out a possibility of bipolar or neurological damage or as Dr. Rosenthal said organicity. If you have indications of that as an attorney who's worth his or her salt should investigate should explore that. And again and we touched on this earlier I was asked about this in my earlier remarks and it was touched on some in rebuttal I do not see the inconsistency presenting evidence at the penalty phase that for example as Judge Reinhart mentioned one being bipolar. I don't see the conflict between that and whether or not Behmor supposedly was committing a robbery at the warehouse or somewhere else even though that's not an alibi. An attorney has to investigate and present evidence and if the client and I don't see the conflict. They put on 40 witnesses  even though the jury was convinced that he had brutally slain Mr. Muck in that robbery it seems like they could have also maybe put on some evidence that he does have some disabilities that the reason he failed as a police officer the reason he failed in all of these schools where he went to play basketball was because he just mentally did not have the faculties to function at a reasonable level. And if unless there are any other areas we need to address I will for once stop talking and finish hopefully a minute or so early. Can I ask you a question? Yes. Okay. Judge Gould? Thank you very much. No questions here. Oh. Thank you. Thank you, Your Honor. The case disargued will be submitted the court will stand in recess for the day.
judges: REINHARDT, GOULD, BERZON